UNITED STATES of America,
Appellee-Cross-Appellant,

v.

Patrick J. CUNNINGHAM,
Defendant-Appellant-Cross-Appellee,

and

John J. Sweeney, Defendant-Appellant.

Nos. 25, 26, 27, Dockets 83–1046, 83–1052, 82–1402.

United States Court of Appeals, Second Circuit.

Argued Sept. 28, 1983.
Decided Nov. 28, 1983.

Michael E. Tigar, Washington, D.C. (Samuel J. Buffone, John J. Privitera, Tigar & Buffone, Washington, D.C., of counsel), for defendant-appellant-cross-appellee Cunningham.

Taylor R. Briggs, New York City (Donald J. Greene, Kim Hoyt Sperduto, Leon E. Roday, LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel), for defendant-appellant Sweeney.

Gerard E. Lynch, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee-cross-appellant.

Before MANSFIELD, KEARSE and WINTER, Circuit Judges.

MANSFIELD, Circuit Judge:

Experience teaches that unlawful cover-up offenses are often more heinous than the crime sought to be concealed. This case falls squarely within that maxim. Patrick J. Cunningham and John J. Sweeney appeal from judgments of the Southern District of New York entered by Judge Charles L. Brieant, Jr. after a jury convicted them of offenses related to income tax evasion, obstruction of investigations by the Internal Revenue Service (IRS) and a grand jury, and making false statements to the IRS, the U.S. Attorney, a grand jury and a federal district court.[1] The jury found Cunningham guilty of conspiracy, 18 U.S.C. § 371 (Count 1), tax evasion for the years 1974 and 1975, 26 U.S.C. § 7201 (Counts 2 and 4), filing false returns for 1974 and 1975, 26 U.S.C. § 7206(1) (Counts 3 and 5), inducing John Spain to make false statements to IRS agents, 18 U.S.C. §§ 1001 and 2 (Counts 6 and 7), making false statements to agents of the IRS and the U.S. Attorney, 18 U.S.C. § 1001 (Count 11), and giving false testimony before a United States dis-

trict court, 18 U.S.C. § 1623 (Count 13). Sweeney was found guilty of conspiracy, 18 U.S.C. § 371 (Count 1), making false statements in testimony before a federal grand jury on July 10, 1980, and July 17, 1980, 18 U.S.C. § 1623 (Counts 9 and 10), and making false statements to agents of the IRS and the U.S. Attorney, 18 U.S.C. § 1001 (Count 12).[2]

Following the trial, Judge Brieant granted Cunningham's motion to set aside the guilty verdicts on Counts 2, 4 and 5 and enter a judgment of acquittal on those counts, from which the government appeals. We affirm the convictions, reverse the district court's order and judgments acquitting Cunningham on Counts 2, 4 and 5, and remand these counts for sentencing and entry of judgments of conviction.

The record, viewed as it must be in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), reveals the following. From 1964 to September 1971 Cunningham and Sweeney, his brother-in-law, practiced law under a loose partnership arrangement in New York City with James F. O'Donoghue. Thereafter until 1978 they ceased to be partners but practiced separately in the same office suite. From September 30, 1978 through September 1981 they resumed law practice together with Marc Krieg in a professional corporation.

In 1974 and 1975, when Cunningham and Sweeney were practicing law separately, Sweeney made a series of payments in an unusual manner to or for the benefit of Cunningham. The payments were made not by checks drawn on Sweeney's regular business checking account but by means of bank checks drawn on an Irving Trust Company escrow savings account into which

---

1. John Spain and Marie Falco were named as co-conspirators. Their participation is described later herein.

2. A portion of Count 1 of the indictment, charging conspiracy to evade Cunningham's 1972 income tax, was stricken by the district court before trial as barred by the statute of limitations. Count 14, which charged Cunningham

with violation of 18 U.S.C. § 1510 was dismissed before trial with the government's consent.

The jury acquitted Sweeney of Count 8, which charged him with perjury before the grand jury on April 5, 1979, in violation of 18 U.S.C. § 1623.

Sweeney normally deposited funds belonging to his clients (e.g., settlement proceeds, tenants' funds, or payments toward closings). There was no requirement that the bank checks be reported to any authority. Nor were the payments, with one exception, recorded in Cunningham's ordinary personal or business records or bank accounts. In 1974, for instance, Sweeney drew four bank checks totalling $9,436 on the escrow account, one to Cunningham and three to schools attended by his children. In 1975 Cunningham received similar checks totalling $6,062 made out to schools in payment of his children's tuition bills. In addition, Sweeney paid $13,870 in connection with Cunningham's purchase of a new home.

There was evidence from which the jury could reasonably infer that the payments were made from the escrow account rather than from Sweeney's regular business account and not recorded on Cunningham's records in order to conceal the fact that Cunningham, who was at various times Chairman of the Bronx and New York State Democratic Committees and a member of the National Committee of the Democratic Party, was receiving a portion of fees resulting from state court appointments in probate and guardianship matters in which Cunningham did no work. Disclosure of the income or its source would have embarrassed him as a political leader by giving the appearance that the appointments were the result of his exercise of political influence with respect to the appointing judges and would also have required him to pay income taxes on the monies received.[3]

Sweeney kept a careful private accounting of these payments through pencilled notations in his own handwriting on his copies of monthly escrow account statements received from Irving Trust Co. The pencilled notations showed that after deduction of certain expenses the amounts paid to or for the benefit of Cunningham represented roughly half of the sums Swee-

ney received from court-appointed matters. That Sweeney and Cunningham were trying to conceal these payments could further be inferred from Sweeney's efforts to avoid turning over his copies of the escrow account statements to a federal grand jury convened in January 1979 to investigate Cunningham's possible tax evasion. Sweeney initially advised the grand jury on April 5, 1979, that he was not producing the statements because IRS Agent Glenn Ripa had told him that they were not needed and he was later acquitted of the charge (Count 8) that this statement was perjurious. However, after it became clear that his copies of the statements were being subpoenaed he refused to comply. On July 10, 1980, when he appeared before the grand jury for a second time, he expressly refused to turn over the statements, now claiming that they were protected by the attorney-client privilege. After that hearing, when he was ordered to show cause why he should not be held in contempt, Sweeney agreed to produce the statements. Yet when he returned to the grand jury on July 17, he did not do so. The statements finally were turned over by his attorney while Sweeney was out of the country; by that time, the pencilled notations—which were at the heart of the government's case—had been erased. It was only through infrared enhancement that the FBI was able to restore the notations and uncover the secret accounting.

In October 1975 Cunningham filed his federal income tax return for the year 1974, which did not report as income $9,436 received in 1974 from the Sweeney escrow account. If disclosure had been made he would have had to pay an additional $5,057 in taxes over the $37,539 paid. In October 1976, by which time Cunningham knew he was under IRS investigation, Cunningham filed his federal tax return for income received in the year 1975, which reported the $6,062 received in 1975 from the escrow account but did not report the $13,870 received from Sweeney in April 1975. If re-

3. Cunningham was in 1975 the subject of an investigation by New York State Special Prosecutor Maurice Nadjari who was looking into

charges that he had exercised improper political influence in the selection of state judges.

ported as income the $13,870 would have increased his tax liability by $9,709.

There was additional evidence supporting the jury's verdict that Cunningham, acting in concert with Sweeney, attempted to evade reporting the $9,436 income received from Sweeney in 1974 and at least part of the $13,870 received from Sweeney in 1975. They engaged in conduct designed to obstruct government investigations into the nature and source of these payments and to cover up the evasion. In December, 1975, Cunningham learned that he was under IRS investigation. His 1974 return had been filed and little could be done to alter his failure to report the $9,436 of covert income he received that year from Sweeney. However, Sweeney's Irving Trust escrow account statements made it plain that Cunningham would in 1976 be obligated to report as income payments totalling $19,932 received in 1975 from Sweeney (including the $6,062 paid as tuition for Cunningham's children) as a division of legal fees. Instead of reporting this income and the sources on his federal income tax return for 1975, however, Cunningham decided to report only the $6,062 and to claim that $13,870 represented a non-taxable loan.

With respect to the $13,870, Sweeney corroborated Cunningham's account by advising Cunningham's tax lawyer, Barry London, that $10,000 of this sum represented part of a non-taxable $45,000 "gap" loan needed by Cunningham to purchase a new house, $35,000 of which had been borrowed from the Sterling National Bank, and that the balance of $3,870 constituted the portion of the non-taxable advance from Sweeney that had yet to be repaid. Recognizing that this story could be refuted by his pencilled notations on his copies of the Irving

Trust escrow account statements, Sweeney made repeated efforts to avoid turning over his copies of these bank records. As noted above, his pencilled computations showing the actual nature of the payments to Cunningham were erased and his copies were not turned over to the government until he was threatened with contempt.

In the meantime Sweeney testified before the grand jury that he loaned Cunningham nearly $13,900 in 1975 whereas his obliterated notations together with other evidence showed that the payments represented a division of legal fees from 1974-75 court appointments.[4] In 1980 Sweeney also falsely advised the U.S. Attorney's office and testified before the grand jury that other payments made by him to or for Cunningham (e.g., tuition for the latter's children) were from legal fees due in connection with the 1971 dissolution of their former law firm whereas in fact they were from later state-court appointments.[5] Upon being interviewed by the U.S. Attorney's office in 1980 Cunningham conceded that the $9,436 received in 1974 from Sweeney (some directly and some to schools for his children) "probably" represented reportable income overlooked by him but that the $13,870 received in 1975 constituted non-taxable loans not yet repaid.

As another step designed to conceal the income received from Sweeney in 1975 Cunningham, after he learned in December, 1975, that he was under IRS investigation but before he filed his 1975 return, decided to create some fictitious cash receipts that he could report on his 1975 income tax return as received that year from other sources, which would serve to account for otherwise unexplained cash in his possession. His reporting of cash income from

4. Even if one assumes, because Cunningham had only a $5,500 credit in the escrow account in April 1975 when Sweeney paid $10,000 toward Cunningham's purchase of a house, that the payment was partly a loan, that loan was soon converted into taxable income. In July 1975 Sweeney credited Cunningham with $15,675 in the escrow account for more legal fees from court appointments, in addition to which Sweeney made $6,062 in tuition payments for Cunningham's benefit and $3,870 more toward

the purchase of the house. Thus, regardless how the April 1975 payment is characterized, Cunningham received from Sweeney in 1975 $13,870 which was not reported on Cunningham's return.

5. Since Cunningham reported his income on a cash basis he was in any event obligated to pay a tax on legal fees received in 1975, whether or not attributable to an earlier year.

other sources could mislead the IRS into abandoning its investigation into his 1975 income. Whatever the motive, he induced a friend, John Spain, to agree to falsely tell the IRS that Spain had in 1975 paid him $2,000 cash for legal services. He similarly induced another friend, Joseph Cioccolanti, to agree to falsely advise the IRS that he had given Cunningham $4,000 cash. Cunningham then included on his 1975 return $8,000 cash legal fees received (he later claimed that this included, in addition to the $6,000 from Spain and Cioccolanti, $2,000 from George Steinbrenner). In January 1978 interviews requested by the IRS Spain, living up to his promise to Cunningham, falsely advised IRS Agent Glenn Ripa and another agent that in 1975 he had paid a $2,000 cash legal fee to Cunningham. However, when Spain was later called before the grand jury on two occasions in July 1980 and asked about the payment he twice testified that he had never paid a $2,000 legal fee to Cunningham and he denied under oath that he had so told Agent Ripa.

Sweeney's testimony before the grand jury and Cunningham's statements in interviews by the U.S. Attorney's office regarding the nature of the payments received by Cunningham or made for his benefit in 1974 and 1975 were belied by the government's restoration of Sweeney's erased pencilled accounting on his copies of the Irving Trust escrow account statements. These revealed that the payments were taxable shares of legal fees from state court appointments, not loans or pre-1972 legal fees. In January 1981 Cunningham and Sweeney were given the opportunity, in tape-recorded government interviews later introduced at their trial in the present case, once again to explain the payments and the source of the $8,000 cash legal fees reported by Cunningham as received·in 1975. Essentially they stuck to the outlines of their earlier version that the $13,870 represented loans. Both continued to state that $10,000 of the $13,-870 was borrowed to complete a $45,000 "bridge" loan needed to finance Cunningham's purchase of a new home after Sweeney had been told by the bank that it would not loan more than $35,000. However, Cun-

ningham could not now recall receiving $2,000 from Spain as the source of a portion of the $8,000 listed as cash receipts. Although he admitted that the $9,436 received from Sweeney in 1974 represented legal fees he did not remember whether he had reported it on his income tax return. Nor could Cunningham recall whether he had paid back the loan from Sweeney for purchase of the house or still owed this amount to Sweeney.

In October 1980 Spain was indicted on the charge that he committed perjury in denying to the grand jury that he told Agent Ripa that he had paid $2,000 to Cunningham. Thereupon he consulted Cunningham, whose secretary, Marie Falco, presented to Spain what purported to be a contemporaneous memorandum typed by her on the same day as Spain's interview with Agent Ripa 2½ years previously (January 25, 1978). The memo reported Spain as denying to Falco that he had told Ripa that he had paid any cash to Cunningham. The memorandum was introduced by Spain at his February 1981 trial on the perjury charge after authentication by Ms. Falco. Suspecting that it was fabricated, the government obtained from Judge Wyatt of the district court a subpoena ordering Cunningham's law firm to produce "forthwith" any typewriters in its possession of the model used to type the purported memorandum of January 25, 1978. The government planned to examine the typewriter ribbons (which were carbon film ribbons that could be used only once and would reveal what had been typed on them) to determine whether the memorandum had recently been fabricated, i.e., typed in November 1980.

Following service of the subpoena by government agents at 4:30 P.M. on the afternoon of February 12, 1981, Marc Krieg, one of the three partners in the firm, asked the agents to leave. Krieg then ascertained that there were two typewriters of the kind subpoenaed, one of which was located on the office's reception desk. At 5:20 P.M. Krieg saw Sweeney carrying the typewriter from the reception desk to his office and

closing the door behind him. When the typewriter was examined by government agents that night it was found to have a new, virtually unused ribbon on it.[6] That evening Krieg advised an Assistant U.S. Attorney that he had seen Sweeney remove the typewriter to his office that afternoon after the subpoena had been served but before the typewriter was turned over to the government. Krieg apparently confirmed this statement in testimony given the next day, February 13, before the grand jury.

On the same date, February 13, 1981, Judge Inzer B. Wyatt, who was presiding at the Spain trial, granted the government's motion for a hearing, which was then held by Judge Edmund Palmieri, to determine whether anyone had tampered with the subpoenaed typewriter before surrendering it to the government. At a continuation of the hearing on February 17, Gay McCreery, receptionist at the Cunningham-Sweeney firm, testified that she had used the subpoenaed typewriter on February 12, 1981, to type addresses on envelopes which Cunningham planned to use in a personal campaign mailing to members of the Democratic National Committee. However, the ribbon on the typewriter turned over by Cunningham and Sweeney in response to the subpoena did not show the imprints of this typing, as it would if it were the ribbon used by Ms. McCreery. When the typed envelopes were then subpoenaed and Krieg and McCreery were unable to find them, Cunningham tes-

tified on February 19, 1981, before Judge Palmieri that after deciding to withdraw from his political race on Monday, February 16, 1981, he stuffed the typed envelopes into his pocket and disposed of them in a street trash basket. This conduct indicated that the typed envelopes had been concealed or destroyed because, if produced, they would prove that the ribbon had been changed on February 12. That in turn would support the government's contention that the telltale ribbon bearing typing imprints of Cunningham's envelopes would also bear imprints of the Spain memorandum, proving it to be a recent fabrication.

Obviously concerned that this important subpoenaed evidence be produced or that its concealment or destruction in defiance of the subpoena be established, Judge Palmieri permitted the government to inquire into the surrounding circumstances. One of these circumstances was revealed by Krieg's testimony that on the night of February 13th, after he had testified that day before a grand jury to facts indicating that Sweeney had changed the ribbon, Falco and Cunningham had telephoned him at his Long Island home from a New York restaurant to find out whether he had given any harmful testimony about the ribbon. Falco testified in the Spain trial before Judge Wyatt that she could not recall such a telephone conversation with Krieg. When asked about the matter on February 19th before Judge Palmieri, Cunningham testified that he could not recall the restaurant

---

**6.** At the trial of Cunningham there was other evidence, including expert testimony, enabling the jury to find that the ribbon had been changed between the service of the subpoena on February 12 and the delivery of the typewriter to the agents on the same date. That the ribbon was replaced in order to conceal the recent fabrication of the memorandum was further supported by Spain's testimony that he had never had the conversation with Falco which she testified to having typed on January 25, 1978.

Sweeney argues that the ribbon on the typewriter had been changed by a service man sometime in late December 1980, or early January 1981—after the Spain memorandum appeared in November 1980—so that in fact the ribbon that was removed from the typewriter on the afternoon of February 12, 1981 would

not have contained imprints from that memorandum. Moreover, Sweeney claims that he was aware of this before the typewriter was turned over to the government on the evening of February 12, so that he had no incentive to change the ribbon that day. While there was testimony that when questioned by Sweeney, Ms. McCreery told him that the ribbon had been changed in December or January, the jury could well have concluded that Sweeney doubted the accuracy of the undocumented information provided by McCreery (indeed, Sweeney conceded that he called McCreery at home on the evening of February 13 to question her further) and decided to take no chances in the matter. Certainly there can be no dispute but that the ribbon was changed after the subpoena was served.

he visited on the night of February 13th. Disclosure of the name of the restaurant (which the government did succeed in obtaining from other sources) would have enabled the prosecution to obtain toll call records corroborating Krieg's testimony regarding the phone calls from Falco and Cunningham. All of this evidence provided the basis for the perjury charge against Cunningham alleged in Count 13.

Thus there was overwhelming proof that Cunningham and Sweeney sought to obstruct the Spain trial by concealing or destroying the typewriter ribbon that they feared would have revealed the recent fabrication of the purported January 25, 1978, Spain memorandum and that Cunningham then sought to cover up this obstruction by giving false testimony at the hearing before Judge Palmieri.

Although Cunningham and Sweeney testified in their own defense at the trial of the present case, their efforts to explain incriminating facts were clearly refuted by other evidence and rejected by the jury as incredible. Indeed, Cunningham had no explanation for his failure to report his 1974 income. While he sought to explain the $8,000 cash income reported on his 1974 return as coming from Spain ($2,000), Cioccolanti ($4,000) and George Steinbrenner, owner of the New York Yankees ($2,000), his testimony was inconsistent in material respects with his statements in earlier government interviews and with other proof. For instance, he described in detail a $2,000 payment purportedly received from Steinbrenner at Yankee Stadium during a 1975 ball game, only to be faced with the fact that that Stadium was undergoing renovation and was inoperative at that time.

Sweeney's testimony that his payments in 1975 to Cunningham did not represent a sharing of state-court appointment fees but a repayment of old firm debts was refuted by his handwritten accountings on the Irving Trust bank statements. His effort to label the payments of $13,870 in 1975 to Cunningham as loans was likewise shown on cross-examination to be riddled with inconsistencies, entitling the jury to reject his testimony as incredible.

After the jury on June 18, 1982 returned its verdict finding Cunningham guilty of 9 counts and Sweeney guilty of 4 counts, Judge Brieant on October 25, 1982, granted Cunningham's motion for a judgment of acquittal on Counts 2 (evasion of $5,057 tax due for the year 1974), 4 (evasion of income tax due for the year 1975), and 5 (filing of a false federal income tax return for the year 1975). Judge Brieant reasoned that the amount of income tax evaded for the year 1974 was not "substantial" enough to violate 26 U.S.C. § 7201. With respect to Counts 4 and 5 the court, although conceding that the evidence established that Cunningham and Sweeney had conspired to evade payment of the former's income tax due for the year 1975, concluded that since Cunningham knew he was under IRS investigation he had decided not to evade payment of the taxes due on the $13,870 income received from Sweeney in 1975.

## DISCUSSION

### Cunningham

Cunningham first argues that his conviction of perjury committed during the hearing before Judge Palmieri (Count 13) must be set aside on the grounds that the Palmieri court lacked jurisdiction to hold a hearing to determine whether Cunningham's firm had fully complied with the subpoena issued in the Spain case and that Cunningham's testimony was immaterial. He further contends that his conviction of conspiracy (Count 1) must also be reversed because certain criminal objectives and overt acts alleged in Count 1 were the subject of substantive counts that were dismissible as a matter of law (Count 13), dismissed by Judge Brieant after the guilty verdicts (Counts 2, 4 and 5), or no longer sustainable in view of Judge Brieant's withdrawal of certain specifications of false testimony alleged in Counts 1 and 11. We disagree.

Count 13 charged Cunningham with violation of 18 U.S.C. § 1623, which prohibits the making of false statements under oath "in any proceeding before ... any court

... of the United States." The proceeding at which Cunningham testified was conducted by the district court to determine whether Cunningham or anyone else in his law firm had failed to comply with a valid subpoena, and to enforce compliance with the subpoena by such civil contempt orders as might become necessary. Non-production of records by the possessor in open court in defiance of the court's order would clearly provide the basis for a coercive civil contempt order.

█ Cunningham contends that the district court lacked authority to conduct a hearing for the purpose of determining whether there had been compliance with its Rule 17(c) subpoena. He argues that no "case or controversy" existed within the meaning of Art. III, § 2, of the Constitution and that the court was therefore relegated to an adversarial proceeding under Fed.R.Crim.P. 42(b). We disagree. Trial courts have the "inherent power to enforce compliance with their orders through civil contempt.... And it is essential that courts be able to compel the appearance and testimony of witnesses." *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); 28 U.S.C. § 1826(a). The same principle governs the court's authority to compel production of documents or records subpoenaed by it.

An appropriate step toward compelling production is an evidentiary hearing to ascertain the whereabouts of the subpoenaed materials and to give the person charged an opportunity to explain why they have not been produced. *See In re Grand Jury Investigation,* 545 F.2d 385 (3d Cir.1976); *In re Bianchi,* 542 F.2d 98 (1st Cir.1976); *In re Bonk,* 527 F.2d 120 (7th Cir.), *stay denied,* 423 U.S. 942, 96 S.Ct. 350, 46 L.Ed.2d 274 (1975). To relegate the court to slower, more protracted proceedings would unduly hamper its conduct of an on-going trial and encourage non-compliance. Moreover, in its compliance hearing the court should be accorded broad latitude to uncover facts with respect to the concealment or destruction of the subpoenaed evidence. Under 28 U.S.C. § 1826(a) the court is empowered to issue a coercive contempt order provided basic due process procedures are observed, *In re Kitchen,* 706 F.2d 1266, 1271 (2d Cir.1983); *In re Rosahn,* 671 F.2d 690, 697 (2d Cir. 1982). There was no denial of such due process by Judge Palmieri in the compliance hearing in this case.

Decisions relied upon by Cunningham for the proposition that the court is powerless to hold such a hearing are clearly distinguishable. In *Brown v. United States,* 245 F.2d 549 (8th Cir.1957), the grand jury of the District of Nebraska obviously lacked authority to investigate a crime committed in the Eastern District of Missouri. Similarly, courts lack authority to compel parties to continue the conduct of properly settled litigation, *Hunger v. Andrus,* 476 F.Supp. 357, 360 (D.S.D.1979), to force a United States Attorney to sign an indictment, *United States v. Cox,* 342 F.2d 167 (5th Cir.), *cert. denied,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), or to adjudicate non-existent cases. *See, e.g., Jett v. Castaneda,* 578 F.2d 842, 845 (9th Cir.1978) ("Without an indictment or other charge bringing a defendant before the court ... a district court has no general supervisory jurisdiction over the course of executive investigations."). It is in situations such as these that the "case or controversy" requirement bars judicial proceedings. No such situation obtains here where the district court had a pending criminal trial in progress for which the materials had been subpoenaed.

The ribbon subpoenaed from Cunningham's office was a crucial piece of evidence needed in the on-going *Spain* trial for the reason that the ribbon probably would have revealed that the Spain memorandum was a recent fabrication. Examination of the typewriter indicated that a new ribbon had just been installed. This and other evidence (e.g., Krieg's Feb. 12, 1981, description of his having seen Sweeney remove the typewriter from the receptionist's desk to his office in the short period after the subpoena was served and before the machine was surrendered) provided grounds for reasonable belief that the telltale ribbon had

been removed and a substitute installed. Under these circumstances Judge Wyatt acted within his authority in ordering an immediate hearing to determine the facts and to use the court's coercive civil contempt power, if necessary, to secure compliance with the subpoena, including production of the ribbon and any other related materials bearing on its replacement. Since Judge Wyatt was actively engaged in trial of the *Spain* case and could not conduct two proceedings at the same time, he properly had another Article III judge of the same court conduct the compliance hearing. *See, e.g., United States v. Teresi,* 484 F.2d 894 (7th Cir.1973). Once that hearing got under way Judge Palmieri was entitled to explore fully the surrounding circumstances, including evidence bearing on the credibility of Falco, and on her February 13th phone call to Krieg to determine what he had testified regarding the typewriter.

■■■■ Cunningham's next argument, that his testimonial inability on February 19th to recall the restaurant to which he and Falco went on the night of February 13th was immaterial to the Palmieri hearing, must likewise be rejected. Materiality is ordinarily to be determined by the court by a preponderance of the evidence. *United States v. Berardi,* 629 F.2d 723, 727–28 (2d Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980); *United States v. Marchisio,* 344 F.2d 653, 665 (2d Cir.1965). Here Cunningham's perjured testimony was adjudged to be material both by the trial judge and by the jury, to which Judge Brieant delegated the issue with directions that the government must establish materiality by proof beyond a reasonable doubt, thus giving Cunningham a dual advantage (determination of materiality by the jury as well as by the judge and imposition of a higher standard of proof) to which he was not entitled. *United States v. Berardi, supra.*

Regardless of the scope of the proceeding in which testimony is given, *see United States v. Byrnes,* 644 F.2d 107, 111 (2d Cir.1981) (grand jury); *United States v.*

*Freedman,* 445 F.2d 1220, 1226–27 (2d Cir. 1971) (SEC hearing on alleged securities law violation), the test of materiality is essentially whether a truthful answer would have aided the inquiry. *United States v. Berardi, supra,* 629 F.2d at 728. In the present case the inquiry was with respect to the existence of the typewriter ribbon used to type the Spain memorandum and Cunningham's political campaign envelopes, both of which had been subpoenaed by the court. If Cunningham had truthfully disclosed the restaurant he and Falco visited on February 13th the government would, by obtaining that restaurant's toll calls for that date, have had the opportunity to establish that they had called Krieg at his Long Island home. Along with all the other suspicious circumstances, this would have been one more piece of evidence indicating that they were trying to prevent disclosure of Sweeney's removal of the ribbon and thereby avoid Cunningham's being compelled to produce the envelopes or face a civil contempt order. Truthful testimony would thus have confirmed Judge Palmieri's earlier impression that the missing evidence existed within Cunningham's control and that he had failed to furnish a reasonable explanation for his failure to produce it. See *Sigety v. Abrams,* 632 F.2d 969, 974–75 (2d Cir.1980) (an inference of continuing possession may be drawn by the court with respect to materials known to be in the possession of a subpoenaed witness shortly before service of a subpoena). Cunningham's movements with Falco on the night of February 13th were therefore material to Judge Palmieri's inquiry.

Cunningham next contends that his conviction of conspiracy (Count 1) must be set aside because some of the objectives which are charged as substantive counts (income tax evasion (Counts 2 and 4) and filing of a 1975 false income tax return (Count 5)) were dismissed by Judge Brieant after the trial and another objective (perjury (Count 13)) should be reversed. Relying principally on *United States v. Natelli,* 527 F.2d 311 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976), he argues that the jury might not have reached a guilty

verdict in the broad conspiracy charge if these objectives had been eliminated before the case was submitted to it.

Since we here affirm the perjury conviction (Count 13) (see *supra*) and reverse the dismissal of Counts 2, 4 and 5 (see *infra*), the essential premises upon which Cunningham bases his argument evaporate. Even aside from this fatal defect, however, since conspiracy is a separate crime from the substantive offenses which may be its aims, proof that the defendants failed to achieve their unlawful objectives would not entitle them to a dismissal or retrial of the conspiracy charge. *United States v. Frank,* 520 F.2d 1287, 1290–91 (2d Cir.1975), *cert. denied,* 423 U.S. 1087; 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). Indeed where, as here, some objects of a conspiracy have clearly been achieved, we will not normally upset the conspiracy conviction because others have not. *United States v. Sindona,* 636 F.2d 792, 799 n. 5 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981).

For similar reasons the court's post-verdict withdrawal from Count 11 of one of the specifications of Cunningham's false statements (that Sweeney told him that the maximum loan he could obtain from the Sterling National Bank was $35,000) does not affect the jury's guilty verdict on that count. Cunningham now contends that the Count 11 conviction should not stand because it is possible that the jury was unanimous only as to the dismissed specification. *See United States v. Natelli, supra,* 527 F.2d at 325. However, his failure to object at trial to multiple specifications precludes his raising the issue on appeal. *See United States v. Bonacorsa,* 528 F.2d 1218, 1222 (2d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976).

Regardless of the waiver of the issue the district court in our view erred in dismissing the falsity specification for lack of direct evidence that Sweeney had *not* told Cunningham that $35,000 was the maximum that the bank would loan. There was ample circumstantial evidence permitting the jury to make such a finding. Evidence was introduced to the effect that Sweeney did not in fact seek a $45,000 loan from Mr. Hugh Malloy of the Sterling National Bank. Given Sweeney's demonstrated willingness to transfer to Cunningham his share of fees from court appointments and the absence of any motive for Sweeney to deceive Cunningham as to the true facts or to require him to accept a loan rather than a distribution of fees, the jury could reasonably infer that Sweeney told Cunningham the truth, namely, that Cunningham needed to borrow only $35,000, not $45,000, because he was entitled under their agreement to a distribution of $10,000 in fees from the escrow bank account.

Nor do we find any merit in the claim that the district court erred in failing to instruct in its second supplementary charge to the jury that it might convict Cunningham of conspiracy only if it found that an overt act had been committed within the pertinent limitations periods, namely, after July 1, 1975, in the case of acts in furtherance of tax evasion objectives, 26 U.S.C. § 6531, and after July 1, 1976, as to all other overt acts, 18 U.S.C. § 3282. Judge Brieant originally charged without request or objection by the defendants that the jury could only find the defendants guilty of conspiracy as charged in Count 1 if it found "that persons were committing overt acts in furtherance thereof after July 1, 1976." In response to a later jury request he instructed that the government must prove that the conspiracy existed after July 1, 1976, and that if it found that an overt act had been committed after that date it might infer that the conspiracy existed after that date. This instruction was proper under the circumstances. In any event the jury's verdicts finding Cunningham guilty of substantive crimes occurring after July 1, 1976, which were alleged as overt acts, eliminate any doubt about the matter.

Cunningham also questions his conviction of making false statements to IRS agents and members of the United States Attorney's office on January 15, 1981, in

violation of 18 U.S.C. § 1001, on the ground that admission of his statements violated Fed.R.Evid. 410 and Fed.R.Crim.P. 11(e)(6) because they were made in the course of plea negotiations. However, since no objection to admission of these statements was made at trial the issue, absent a showing of plain error, cannot be raised at this late date. *United States v. Ruffin*, 575 F.2d 346, 355 (2d Cir.1978). Moreover, the tape recordings of the interview demonstrate beyond doubt that no error was committed in admitting them. At the outset of the interview Cunningham, himself a lawyer, and his counsel, an experienced criminal lawyer, stipulated that anything he said could be used against him by a grand jury or in any subsequent proceeding and that if he made a false statement of fact he could be prosecuted for perjury. These stipulations confirm that the interview was not a plea bargaining conference but an effort by him to convince the government that he was not guilty of any crime. The rules invoked by him are inapplicable to such an interview.

■ We have examined the other claims of error advanced by Cunningham and find them to be totally lacking in merit.[7] There was ample evidence of his guilt of Count 3 (filing of false 1974 tax return) and Counts 6 and 7 (inducing John Spain to make false statements to IRS agents on two occasions in January 1978). Although Cunningham's counseling of Spain may have occurred at an earlier date, the crime aided and abetted was not committed until January 1978 when Spain carried out his agreement to falsely tell the agents that he had paid $2,000 to Cunningham. *United States v. Ruffin*, 613 F.2d 408, 412 (2d Cir.1979). Finally, the suggestion that Cunningham must have intended and instructed Spain to lie to a *federal* or *IRS* agent, as distinguished from some other authority, borders on the frivolous. There is no requirement that the aider and abettor have had a jurisdictional intention. *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541

(1975); *Barnes v. United States*, 412 U.S. 837, 847, 93 S.Ct. 2357, 2363, 37 L.Ed.2d 380 (1973).

*Sweeney*

■ Sweeney's first contention is that, although the indictment charged a single conspiracy (Count 1), two conspiracies were proved, amounting to a fatal variance requiring a new trial. *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir.1975); *see Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Count 1 charges a conspiracy by Cunningham and Sweeney from on or about January 1, 1972 to July 1981, joined in by Falco and Spain as co-conspirators, to evade Cunningham's 1974 and 1975 taxes and file false income taxes for those years, to obstruct investigation of these crimes by the IRS and the grand jury, to impede the perjury trial of Spain for denying that in 1978 he told IRS agents that he paid a $2,000 cash legal fee to Cunningham, to make false statements to government departments and to give false testimony to the grand jury. Sweeney claims that the evidence showed, first, a tax evasion conspiracy from 1974 to 1976 and, second, a later separate conspiracy to conceal the first. He argues that the government improperly tried to extend the life of the first, which is barred by the Supreme Court's decisions in *Grunewald v. United States*, 353 U.S. 391, 399, 77 S.Ct. 963, 971, 1 L.Ed.2d 931 (1957), *Lutwak v. United States*, 344 U.S. 604, 616–17, 73 S.Ct. 481, 488–89, 97 L.Ed. 593 (1953), and *Krulewitch v. United States*, 336 U.S. 440, 443–44, 69 S.Ct. 716, 718–19, 93 L.Ed. 790 (1949). We disagree.

Since the question of whether there were multiple conspiracies rather than the single conspiracy charged is one of fact for a properly charged jury (and there was no error in Judge Brieant's charge on that issue) we are normally unwilling in the absence of a showing of plain error to set aside the jury's finding of the single con-

---

**7.** Cunningham has abandoned his argument that the *Spain* compliance hearing violated his Fifth Amendment rights, in view of the Su-

preme Court's recent decision in *United States v. Rylander*, —— U.S. ——, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983).

spiracy charged. *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980); *United States v. Murray,* 618 F.2d 892, 902 (2d Cir.1980); *United States v. McGrath,* 613 F.2d 361, 367 (2d Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980). Moreover, even if two conspiracies were shown the variance would not entitle Sweeney to a new trial in the absence of a showing that it prejudiced his substantial rights. *United States v. Alessi, supra,* 638 F.2d at 474–75.

Here the evidence reveals one continuous conspiracy between Cunningham and Sweeney, joined in by lesser co-conspirators (Spain, Cioccolanti, Falco), to enable Cunningham to evade payment of substantial federal taxes on his 1974 and 1975 taxable income and to take such steps as might become necessary to defraud the government into the belief that all income taxes due for those years had been paid. Sweeney became a member of that conspiracy at the outset when he agreed to conceal his payments to Cunningham of a share of fees in state court-appointed matters by funneling them to Cunningham through the special Irving Trust escrow account. This device was designed to minimize the chances that the unreported income would be detected by the IRS. The aim of the conspiracy, which was to defraud the federal government of the taxes due on Cunningham's reportable income, would not be completed until the government (if it audited his 1974 and 1975 returns as might be anticipated) had been satisfied that all taxes due had been paid. In this respect this case differs sharply from *Grunewald, Lutwak,* and *Krulewitch, supra,* where cover-up or concealment was not an actual part of the basic conspiracy but merely an implied consequence. Here, in contrast, the success of the scheme to defraud depended on the parties' deceit of federal authorities, before and after the filing of the returns, as to the amount of income tax due from Cunningham.

In furtherance of the scheme, when Cunningham came under IRS investigation in 1976, Sweeney sought to carry out their objective by telling Barry London, Cunningham's tax adviser, that $13,870 of the money paid out of the escrow account in 1975 represented non-taxable loans when in fact he knew, as his subsequently restored pencilled accounting later confirmed, that the payments represented taxable income to Cunningham, i.e., a share of fees received in court-appointed matters. Thereafter Sweeney continued to further the conspiracy's objective by refusing to obey a subpoena to produce his copies of the special escrow account statements with their incriminating pencilled notes until he was threatened with contempt, by his erasing the pencilled notations on them, and by his falsely telling IRS agents, prosecutors and the grand jury that the $13,780 payment was a loan and that the tuition payments were from pre-1972 legal fees earned before the dissolution of the former Cunningham-Sweeney-O'Donoghue partnership. Thus, since Sweeney participated in the unlawful activities from the beginning to the end, he would not be able, even if multiple conspiracies had been shown, to demonstrate any resulting prejudice to himself. *United States v. Alessi, supra,* 638 F.2d at 474–75.

■ Nor do we find any merit in Sweeney's argument that he cannot be found guilty of a conspiracy that involved activities and persons unknown to him (Cunningham's arrangement with Spain and Cioccolanti). To be convicted, a member of a conspiracy need not know the identity of every co-conspirator or all of the means employed to achieve the agreed-upon, unlawful objective, as long as he is aware of the essential nature of the plan. *United States v. Gleason,* 616 F.2d 2, 16–17 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980). The evidence of Sweeney's knowledge of the fraudulent scheme and that the obstruction of the Spain trial was in furtherance of the scheme is overwhelming.

■ Sweeney's claim that the trial court abused its discretion in denying him a severance of his trial from that of Cunningham must likewise be rejected. Since Sweeney participated in a series of acts

that were part of the conspiracy, joinder was permissible under Fed.R.Crim.P. 8(b); *United States v. Bernstein,* 533 F.2d 775, 789 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). A trial court's denial of a severance sought under Fed.R.Crim.P. 14, which is addressed to that court's discretion, *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954), will be reversed only upon the appellant's successfully assuming the heavy burden of showing that he suffered substantial prejudice due to the joint trial. *United States v. Carson,* 702 F.2d 351, 366 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); *United States v. Sotomayor,* 592 F.2d 1219, 1228 (2d Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). No such showing is made here.

Sweeney's claim that he was prejudiced by the "spillover" effect of evidence introduced with respect to Cunningham, including the testimony of Spain and Cioccolanti, is unsupportable since all of the evidence would have been admissible against him in a separate trial of him alone as a member of a single conspiracy. Nor are we dealing here with a trial in which there was a strong likelihood of confusion because of the number of counts, the number of defendants, *see, e.g., Katteakos v. United States, supra,* 328 U.S. at 766, 66 S.Ct. at 1248 (32 defendants), or the length of the proceedings. There were only two defendants and the jury was quite capable of giving individual consideration to each, *see, e.g., United States v. Carson, supra,* 702 F.2d at 362 (four defendants not enough to confuse jury), as it demonstrated by acquitting Sweeney on Count 8 (false statement to grand jury on April 5, 1979). Lastly, Judge Brieant protected Sweeney against any possible confusion by carefully instructing the jury to consider separately the charges and evidence against each defendant. Thus Sweeney received a fair trial and his conviction must be affirmed.

### The Government's Cross-Appeal

In ruling upon Cunningham's post-trial motion under Fed.R.Crim.P. 29(c) to set aside guilty verdicts and enter a judgment of acquittal on Counts 2 (1974 tax evasion), 4 and 5 (1975 tax evasion and filing of false return) the trial judge was required to view the evidence in the light most favorable to the government, and to determine

"whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion . . . . If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter." *United States v. Rodriguez,* 706 F.2d 31, 41 (2d Cir.1983) (quoting *United States v. Lieberman,* 637 F.2d 95, 104–05 (2d Cir.1980)).

Similarly, upon our review of the district court's decision we apply the same standard, without need for deference to the trial judge's decision. *See United States v. Artuso,* 618 F.2d 192, 195 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980). Applying this test to the present case we conclude that the district court did not follow these principles and that his decision granting the motion must be reversed.

The district court directed entry of a post-verdict judgment of acquittal as to Count 2, which charged Cunningham with evading taxes for 1974, on the ground that the amount evaded, which it calculated at $2,617 rather than the $5,057 asserted by the government, was not "substantial" within the meaning of that term as used in 26 U.S.C. § 7201. However, "substantiality" is a question for the jury. *United States v. Siragusa,* 450 F.2d 592, 595 (2d Cir.1971), *cert. denied,* 405 U.S. 974, 92 S.Ct. 1195, 31 L.Ed.2d 248 (1972). The jury in this case could reasonably have found on the evidence before it that the tax evaded

by Cunningham was substantial, and indeed it did so find. The evidence was overwhelming that Cunningham had intentionally failed to report $9,436 of taxable 1974 income. An expert witness called by the government testified that following the same methods used by Cunningham to calculate his 1974 tax liability the additional income would have increased his liability by $5,057 for that year. No contrary testimony was offered by Cunningham for the year 1974. Nevertheless, the trial judge, applying post-trial tax arguments not addressed to the jury, in effect decided that income averaging based on Cunningham's receipt of $12,500 in an earlier year should not have been used even though Cunningham's counsel had stated at trial that he did not dispute its use. Using his own method, the trial judge concluded that the amount of tax evaded would thereby be reduced by $1,440.[8] The judge further concluded that Cunningham had been entitled to an additional 1974 tax credit of $1,660 by reason of an imputed interest deduction that Cunningham had neither claimed nor made the subject of proof at trial. In substituting his methodology and calculations, based on assertions not before the jury, the trial judge erred. Since a reasonable jury could, on the evidence it found to be credible, have determined that the 1974 tax evaded was $5,057 the trial court was bound by the jury's verdict.

Even if the amount evaded is assumed to have been the $2,617 found by the court, it was error on this record to conclude as a matter of law that it was insubstantial.[9] While it is true that at some point a court may as a matter of law find that the liability avoided was insubstantial, the threshold is a low one, and the court must look to all the circumstances. As we stated in *United States v. Nunan,* 236 F.2d 576, 585 (2d Cir. 1956), *cert. denied,* 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957):

> "But [substantially] is not measured in terms of gross or net income nor by any particular percentage of the tax shown to be due and payable. All the attendant circumstances must be taken into consideration . . . . [A] few thousand dollars of omissions of taxable income may in a given case warrant criminal prosecution, depending on the circumstances of the particular case. Otherwise the rich and powerful could evade the income tax law with impunity."

Among the other relevant circumstances in the present case were the existence of a scheme under which portions of Cunningham's income for two years were not reported, the prolonged attempt to cover up the income, the making of false statements to IRS agents and the U.S. Attorney's office, and perjury before a grand jury and the court. Yet Judge Brieant concluded that the $2,617 was not substantial solely by comparing it to Cunningham's total tax due of $33,539. Such a ruling cannot stand in light of *Nunan.*

The district judge's decision setting aside the jury's guilty verdict on Counts 4 and 5, which alleged tax evasion and filing of a false tax return by Cunningham for the year 1975, is likewise erroneous. The judge decided that although "[t]he proof was more than adequate to show a conspiracy to evade income taxes due from Cunningham for 1974 and 1975"· a jury was nevertheless obligated to have a reasonable doubt as to whether Cunningham continued in October 1976, when he filed his 1975

---

**8.** The government contends that the trial judge's calculations are erroneous and, even accepting his premise that income averaging should not be applied, the reduction of the deficiency would be $52 instead of the $1,440 figure found by the court. Since the judge's determination of insubstantiality must be reversed on other grounds we need not resolve this issue.

**9.** Comparable tax deficiencies have been ruled substantial. *See United States v. Siragusa, su-* pra ($3,956, $900 and $2,209 for three successive years, respectively); *United States v. Gross,* 286 F.2d 59 (2d Cir.), *cert. denied,* 366 U.S. 935, 81 S.Ct. 1659, 6 L.Ed.2d 847 (1961) ($2,500 in *unreported income*). In 1974, the year of Cunningham's tax evasion, the average federal income tax liability of all persons paying income taxes was $1,836. U.S. Bureau of the Census, Statistical Abstract of the United States: 1982–83 (103d ed. 1982) at 256.

return, intentionally to omit any taxable income. Thus, in effect the judge found that an intent to evade existed in 1974 and 1975 but that it must have been abandoned by October 1976.

The court's decision that a reasonable doubt must necessarily exist was based on Cunningham's knowledge by October 1976 that he was already under IRS investigation, which would in Judge Brieant's view lead him to make a "scrupulous effort" to be careful in preparation of his 1975 return, and on Cunningham's consultation of a tax attorney (Barry London) whom he referred to Sweeney for information about the $19,932 paid by him to Cunningham. With respect to the latter, the trial judge concluded that the failure to report the $13,870 "loan" was attributable to error or wrongdoing on Sweeney's part.

Here again, however, the jury had evidence before it entitling it to find that Cunningham intentionally filed a false 1975 return even though he knew he was under investigation. First, Cunningham lied to his tax attorney about the source of $8,000 of the income reported by him. Secondly, Sweeney had all along cooperated with Cunningham to evade payment of income taxes and was not likely, in view of his careful pencilled accounting notes, to have mistaken the $13,870 payment for a loan instead of a sharing of court-appointment legal fees. Given this evidence, including the credibility of Cunningham and Sweeney as witnesses, the jury could have reasonably found beyond a reasonable doubt that, while Cunningham felt forced by the pending investigation to report the $6,062 tuition payments made out of the escrow account as income, he and Sweeney were willing to take a chance on evading taxes on the $13,870 by labelling the payment a loan. Under these circumstances the trial judge was not entitled to set aside the guilty verdict simply because he would have reached a different result if he had been the fact-finder. *See United States v. Rodriguez, supra,* 706 F.2d at 41.

The judgments of conviction are affirmed. The order and judgments setting aside the jury's guilty verdicts on Counts 2, 4 and 5 are reversed, and the case is remanded for sentencing and judgments of conviction on those counts.