**UNITED STATES of America, Appellee,**

v.

**Anthony BARI, Tyrone Faines, Robert Benfield, Arthur Harriatt, and Craig Daniel, Defendants-Appellants.**

Nos. 1441, 1503, 1539, 1607 and 1673, Dockets 84–1056, 84–1057, 84–1058, 84–1062 and 84–1063.

United States Court of Appeals, Second Circuit.

Argued Aug. 6, 1984.

Decided Dec. 19, 1984.

Bertrand C. Sellier, New York City (Richard F. Ziegler, Cleary, Gottlieb, Steen & Hamilton, New York City, of counsel), for defendant-appellant Anthony Bari.

Frank H. Wohl, New York City (Grace Goodman, Rosenman Colin Freund Lewis & Cohen, New York City, of counsel), for defendant-appellant Tyrone Faines.

Thomas L. Gazianis, New York City, for defendant-appellant Robert Benfield.

Philip R. Edelbaum, New York City, for defendant-appellant Arthur Harriatt.

Peter Shelley Zeiler, New York City, for defendant-appellant Craig Daniel.

Michael R. Bromwich, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., Marc J. Gottridge, Asst. U.S. Atty., New York City, of counsel), for appellee United States of America.

Before VAN GRAAFEILAND and WINTER, Circuit Judges and BARTELS, District Judge.*

WINTER, Circuit Judge:

Anthony Bari, Arthur Harriatt, Tyrone Faines, Craig Daniel and Robert Benfield appeal from their convictions after a twelve day jury trial before Judge Edelstein. The five defendants were each convicted of conspiracy, 18 U.S.C. § 371 (1982), and attempt to escape from prison, 18 U.S.C. § 751(a) (1982). The jury acquitted an additional defendant, Marc Manns. Appellants raise numerous claims of error involving, among other things, the conduct of the prosecutor before the grand jury, evidentiary and other rulings at trial, improper joinder, and ineffective assistance of counsel.

We affirm.

### BACKGROUND

The evidence against appellants consisted largely of testimony by fellow inmates and a number of physical exhibits. Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942), the pertinent facts may be summarized as follows. During late July and early August, 1982, appellants were incarcerated in J Dorm on the eleventh floor of the Metropolitan Correctional Center ("MCC"), a federal prison in lower Manhattan. In mid-July Benfield began recruiting residents of the various eleventh floor dormitories for an attempted jailbreak. The plan was to break through a window near the floor next to Benfield's bunk bed and then to climb down from the eleventh floor to the street using bed sheets fashioned into a rope. The window was comprised of several alternating layers of glass and Lexan (a hard plastic material) and was protected by two bars.

Benfield quickly assembled a team and divided up assignments. Benfield and Bari moved their bunk bed and a locker so as to block the window from general view. Faines and Harriatt began collecting bed sheets from prisoners as they were transferred out of J Dorm for use as a rope, while Benfield collected pieces of metal that could be used to chip away at the window. Harriatt and Daniel collected chains from exercise equipment. These items were concealed in the J Dorm bathroom when not in use. To carry them from the bathroom to the window, Bari, Benfield, Harriatt and Faines concealed the escape materials in their jumpsuits. Daniel guarded the bathroom while such activities were under way and prevented other inmates from entering it. Throughout this period Bari and Faines were chipping at the window glass and sawing at the bars protecting the window with a hacksaw blade. They had also obtained an iron, which they connected to a light fixture and used to melt the glass.

In late July, Harriatt asked David Tobias to join the attempt. Tobias refused. On August 1, Tobias sent an unsigned note to the warden of the MCC in which he stated that Bari, Harriatt, Benfield, Daniel, Faines, and inmate Lindsay (who moved to another dorm the next day) were planning an escape. The note failed to provoke a response. Meanwhile, appellants made post-escape plans, which included robbing a bank after attacking a corrections officer on the street to get his gun.

The following day at approximately 6:00 p.m., Bari completed cutting through one of the bars in front of the window. At approximately 3:00 a.m. on August 3, as Bari was using a blowtorch and newspapers to burn the window, one of the inmates spotted a guard approaching the dorm. Bari stated that he was going to kill the guard with a homemade knife. Fortunately, the guard merely looked into the dorm and then returned to his post. The work on the window then resumed.

At approximately 4:00 a.m., the guard returned and entered the dorm to get Har-

---

* The Hon. John R. Bartels, Senior District Judge for the Eastern District of New York, sitting by designation.

riatt for his shift in the prison cafeteria. Bari continued his efforts on the window, with Faines acting as a lookout. At 6:00 a.m., with dawn breaking, Bari gave up, stored the escape paraphernalia in the dorm bathroom, and agreed with Faines to continue their efforts that evening. By this time the window was shattered, a hole was burned in it, and a bar was pulled away.

Later that morning, during a routine inspection of the windows and bars, a guard discovered the escape attempt. The prisoners were immediately removed from the dorm, and Bari was found to have numerous cuts on his hands. While the inmates from J Dorm were being held in another room, Faines threatened violence against anyone who implicated Daniel.

The following day, a plumbing foreman at the MCC searched the vents and plumbing of J Dorm. In a panel in the bathroom he discovered, *inter alia*, ninety-three feet of bed sheets braided into a rope, parts of broken chairs and a broken pool cue, chains, hacksaw blades, a penknife, a homemade knife, electrical wire, welding gloves, a newspaper with Harriatt's name on it, pieces of metal, and broken pieces of glass. The glass was later found to have type O blood dried on it, which matched Bari's blood type.

The jury convicted each appellant of conspiracy and attempt to escape. On the conspiracy count, Benfield and Bari received five year sentences; Faines, Harriatt, and Daniel received four years. On the attempt count, Benfield received four years, Bari received four years, Faines received three years, Harriatt received four years, and Daniel received three years. All terms were consecutive with each other and with any other term the appellants were then serving. Daniel was sentenced to an additional six months for criminal contempt for a savage outburst at the district judge during the sentencing hearing.

## DISCUSSION

Appellants raise a host of claims of error, some of which are so without merit as not to warrant discussion. The others we treat seriatim.

### 1. *The Grand Jury Proceedings*

Appellants claim the prosecutor obtained the indictments through misconduct relating to the grand jury testimony of Tobias. That misconduct is said to be found in the prosecutor's allowing Tobias to lie about his prior relationship with the government, reading a transcript of Tobias' testimony rather than presenting him as a live witness, and allowing him to give inflammatory and prejudicial testimony relating to appellants' escape plans.

Tobias, who has a lengthy criminal record, had earlier pled guilty to grand theft by deception in an Ohio state court and had been sentenced in April, 1982 to one to five years in prison. Almost immediately upon his incarceration, Tobias contacted the New York office of the Federal Bureau of Investigation with an offer to assist an investigation into "corruption in boxing." He was transferred to the MCC in June of 1982, approximately two months before the escape attempt. Upon Tobias's arrival at the MCC, he asked Assistant United States Attorney ("AUSA") Roanne Mann to help him obtain probation from the sentencing judge in Ohio. However, based on a recorded telephone call and polygraph examination, she had concluded that Tobias had been untruthful in the boxing investigation and so informed the Ohio court by letter. The letter did note that Tobias had been regarded as helpful in an unrelated investigation into an escape attempt from the MCC.

Tobias remained at the MCC until the end of April, 1983. During that month, he told a grand jury investigating the attempted escape from the MCC that he was serving a prison term for grand theft, that he was in the MCC to help the government in an investigation into corruption in boxing, but that he was no longer "working on that investigation." However, the AUSA present at the grand jury did not disclose that the government did not believe Tobias's testimony regarding that investigation.

After the grand jury directed the AUSA to ask Tobias about his motivation for testifying, Tobias stated that he had absolutely no agreement with the government, was expecting no help in an upcoming parole hearing in Ohio, and was testifying simply because "[i]t's time I stand up and be a man."

The April grand jury apparently expired before it voted on the indictment. Shortly thereafter, Tobias was transferred back to Ohio. On May 1, 1983, Tobias wrote to the AUSA who presented his testimony to the April grand jury and asked for help, noting that he was soon to appear before the Ohio parole board. On June 29, Tobias sent a second letter to one of the marshals who investigated the escape attempt, again asking for help and mentioning the Ohio parole board. Neither letter elicited any help from the addressees.

In July, 1983, a different AUSA read the transcript of Tobias's testimony before the April grand jury to a new grand jury, including the explanation Tobias gave of his motive for testifying, but without any reference to the two letters Tobias had written in the intervening period. The AUSA later stated that he was unaware of those letters until well after the second grand jury indicted the appellants.

Appellants contend that the government's failure to explore fully before the second grand jury Tobias's prior dealings with the government and the two letters he wrote vitiates the indictment and calls for its dismissal. We disagree.

■ The grand jury serves the related purposes of investigating wrongdoing and protecting individuals from unfounded prosecutions. *United States v. Hogan*, 712 F.2d 757, 759 (2d Cir.1983). When, as here, a petit jury has found a defendant guilty beyond a reasonable doubt after hearing all the evidence, including that which was not before the grand jury and the absence of which is claimed to taint the indictment, dismissal of the indictment can be justified only as a method of deterring prosecutorial misconduct. *United States v. Thibadeau*, 671 F.2d 75, 78 (2d Cir.1982). A prosecutor should of course inform a grand jury of

any substantial evidence of which the prosecutor is aware that negates an accused's guilt, *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir.1979), and should respond candidly to a grand jury's inquiries. *See id.* at 622–23. However, dismissal is warranted only where the prosecutor's conduct amounts to a knowing or reckless misleading of the grand jury as to an essential fact. Defendants are not entitled to a full trial before a grand jury, and grand jury proceedings ought not be viewed as fertile ground to be combed for evidentiary or other error.

■ In the instant case, Tobias's May 1 and June 29 letters intervened between his April testimony and the reading of that testimony to the second grand jury. Had the letters in question been written before Tobias's testimony to the April grand jury or had the AUSA who read the April transcript to the July grand jury known of the intervening letters, we might be presented with a more troubling issue. However, we see no reason whatsoever to dismiss an indictment because of a breakdown in communication among the prosecutors which denied the grand jury evidence going at best to credibility and which the convicting petit jury heard in detail.

■ We also reject the argument that the government was obliged, at the risk of having the indictment dismissed, to tell the April grand jury that it did not believe Tobias's evidence regarding corruption in boxing. The fact that a witness has lied on other occasions has some probative value but is not of the same character as evidence directly negating guilt or impeaching a witness as to facts directly tending to prove guilt. *Cf.* Fed.R.Evid. 608(b).

■ We also reject the claim that reading the April transcript to the July grand jury rather than presenting Tobias in person infects the indictment. Although hearsay can mislead a grand jury as to the strength of the government's case, there is no *per se* prohibition on its use. *United States v. Bein*, 728 F.2d 107, 113 (2d Cir. 1984). There was no danger of the grand

jury being misled since the AUSA clearly identified which portions of the testimony were hearsay and informed the grand jury that it had a right to demand live witnesses. *See Hogan,* 712 F.2d at 761; *United States v. Estepa,* 471 F.2d 1132, 1136 (2d Cir.1972).

■ Finally, appellants argue that Tobias's testimony before the grand jury about the plans to kill a guard and rob a bank, and Faines' threat against the other inmates, was inflammatory and prejudicial. This is a wholly frivolous claim and of the kind which will not be entertained with respect to grand jury proceedings. Even if we were to assume that Fed.R.Evid. 403 would exclude this testimony, an heroic assumption in light of the relevance of these plans to the escape attempt, that Rule does not apply to grand jury proceedings. The admission of evidence within the realm of colorable relevance is not misconduct calling for the extreme remedy of dismissal of the indictment even if the prejudicial effect of such evidence outweighs its probative value.

### 2. *The Severance Motions*

Seven days before trial, Daniel moved for a severance, based on an affidavit of his attorney that two non-defendant inmates of J Dorm would provide exculpatory testimony were Daniel tried separately. Three days later, Daniel provided the district court with affidavits of four of his co-defendants stating that they too would provide exculpatory testimony if their trials were completed before Daniel's. During the trial, all defendants except Benfield moved for a severance because of the prejudicial spillover of the similar acts testimony directed at Benfield. In addition, Daniel now cites testimony directed at acts of his co-conspirators as another source of prejudicial spillover. In view of the judicial economies of a single trial and the failure to show prejudice, we reject these claims.

■ A motion to sever under Fed.R. Crim.P. 14 is for the trial court's discretion, *Opper v. United States,* 348 U.S. 84, 94–95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954), and a denial "will be reversed only upon the appellant's successfully assuming the heavy burden of showing that he suffered substantial prejudice due to the joint trial," *United States v. Cunningham,* 723 F.2d 217, 230 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984), amounting to a miscarriage of justice. *United States v. Herrera,* 584 F.2d 1137, 1143 (2d Cir.1978).

■ We may quickly dispose of this claim insofar as the two non-defendant inmates are concerned. The affidavit of Daniel's attorney neither describes the nature of their testimony nor offers a plausible explanation of why they would testify only at a separate trial. Self-serving, conclusory statements that exculpatory witnesses will not testify at a joint trial are not adequate to compel severance. *Cf. United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 297, 83 L.Ed.2d 232 (U.S. Oct. 15, 1984).

■ We think it unlikely that Daniel's co-defendants would actually testify at a separate trial. The offers to testify were expressly conditioned on Daniel being tried last, a condition which smacks of bad faith. *See, e.g., United States v. Parodi,* 703 F.2d 768, 779–80 (4th Cir.1983). Moreover, none of the defendants pled guilty, indicating that they were unlikely to waive the privilege against self-incrimination at a separate trial unless they had already been acquitted. *United States v. Finkelstein,* 526 F.2d 517, 524 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).

■ We also note that the claims relating to the exculpatory testimony are so general that we are unable to determine the nature of the prejudice, if any, to Daniel. The substance of the allegedly exculpatory testimony is not detailed in the various affidavits, and we are thus unable to weigh the importance of any of that testimony against the evidence presented against Daniel at trial. Daniel's burden of demonstrating prejudice is not satisfied by

wholly conclusory statements merely labelling the proffered testimony as exculpatory. *Parodi*, 703 F.2d at 780.

■ Daniel argues finally that he was prejudiced by evidence admitted against his co-conspirators. He was the least active but nevertheless a fully implicated conspirator, and most of the evidence of which he complains would have been admissible against him in a separate trial as acts of co-conspirators in the furtherance of a conspiracy. *United States v. Cunningham*, 723 F.2d 217, 230 (2d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); *United States v. Angelilli*, 660 F.2d 23, 37–39 (2d Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982). Moreover, the district court carefully instructed the jury to consider the acts of each defendant distinctly in deciding his role in the conspiracy. *See United States v. Ventura*, 724 F.2d 305, 312 (2d Cir.1983).

■ Each appellant, save Benfield, argues that his trial should have been severed from Benfield's because of possible confusion and resultant prejudice from evidence of Benfield's prior and subsequent attempts to escape. Our review of the record satisfies us that no such confusion or prejudice occurred. The district court instructed the jury more than once that such evidence related solely to Benfield, and the court repeated that instruction in the jury charge. We do not view the factual issues of this case as unduly complex, and, given the court's clear instructions and the jury's acquittal of Manns, we conclude that the jury was not confused. *Cunningham*, 723 F.2d at 230.

### 3. *Evidentiary Rulings*

The most strenuously contested evidentiary ruling relates to the district court's failure to permit cross-examination of Tobias on his hospitalization for paranoid schizophrenia for a fifteen month period in 1971 and 1972. Before trial, the appellants moved to have a psychiatrist appointed to examine Tobias pursuant to 18 U.S.C. § 3006A(e)(1), to permit cross-examination

of Tobias about his hospitalization, and to introduce his medical records into evidence. The government responded by submitting an affidavit of a psychiatrist who examined Tobias and his hospital records and who concluded that there was "nothing the matter with this patient." The appellants then submitted the affidavit of a psychiatrist who had examined Tobias's hospital records from 1971–72 and the government's September 17 letter rejecting his cooperation. He concluded that Tobias still showed signs of paranoid schizophrenia and would "not be a very credible witness." The district court denied the appellants' motions on the grounds that the twelve year old episode was too remote, that there was other impeaching evidence available, that the digression into Tobias's hospitalization would unnecessarily complicate the trial, and that the prejudicial effect of the evidence would far outweigh its probative value.

During trial, appellants informed the district court that Tobias had boasted to defense counsel that the fifteen month hospitalization was a sham to avoid trial on a then pending criminal charge. Nonetheless, the judge again denied any cross-examination on the subject of Tobias's hospitalization, including the boast.

■ It is within the discretion of the district court to exclude evidence when its "probative value" is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay [or] waste of time." Fed.R.Evid. 403; *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir.1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). The district court has broad discretion over the scope of cross-examination, *United States v. Cambindo Valencia*, 609 F.2d 603, 630 (2d Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *see* Fed.R.Evid. 608(b), and we will not overturn an exercise of that discretion absent a clear showing of abuse. *See United States v. Singh*, 628 F.2d 758, 763

(2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed. 496 (1980).

■ We find no such abuse of discretion. Conducting a mini-trial on Tobias's sanity might well have been a time-wasting, confusing digression ultimately degenerating into a battle of psychiatric opinions. Moreover, his hospitalization had ended over ten years before and was of marginal relevance. *United States v. Glover,* 588 F.2d 876 (2d Cir.1978) (per curiam).

Finally, we fail to perceive any prejudice to defendants resulting from these rulings. A lengthy digression into Tobias's mental health would likely have detracted from the far more cogent attacks mounted on Tobias's credibility. Tobias's cross-examination, at times withering in nature, spanned nearly four hundred pages of transcript. The jury learned: (i) that Tobias had been convicted of grand theft by deception, escape, operating a stolen vehicle, unarmed robbery, breaking and entering, parole violations, and auto theft; (ii) that he was unwilling to disclose his sources of income from 1979 to 1982 and felt compelled to "plead the fifth" when asked about them; (iii) that the government had rejected his cooperation in the boxing investigation because it concluded he was lying; (iv) that he had originally offered his cooperation in that investigation in return for support of his bid for probation in Ohio; and (v) that he had written the May 1 and June 29 letters to the government in the hope of trading testimony for parole in Ohio. Tobias's status as a parolee at the time of trial and its possible effect on his veracity was fully explored, as were his pretrial meetings with the government and the possibility of coaching at such meetings. Tobias's allegedly bad relations with the other inmates were also mentioned.

If Tobias was an otherwise unimpeached witness, this rather hoary psychiatric history might have been of some value to the defense other than as a legal point to be preserved for an appeal, but he wasn't and

it isn't. *Glover,* 588 F.2d at 878; *United States v. Green,* 523 F.2d 229, 237 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). The claim that Tobias was lying or in error because of mental illness based on a decade old hospitalization would have diverted the jury from the much stronger and documented line of attack that he was eager to curry favor with the government in order to gain his release from the Ohio jail. Strong arguments are rarely helped by being joined with weaker ones, particularly when the latter entail lengthy evidentiary exploration, such as the contrasting testimony of two psychiatric experts.[1]

■ Finally, we perceive no abuse of discretion in the court's refusal to permit cross-examination based on Tobias's off-the-record boast that his fifteen month hospitalization was a sham. The district court denied the inquiry because it would have inevitably opened the door on the hospitalization, which, once breached, might have led to the battle of experts. We do not find the exclusion of a boast of a bad act occurring some twelve years before the trial to be an abuse of discretion when a witness's credibility has been so thoroughly attacked otherwise. *Singh,* 628 F.2d at 764; *United States v. Coughlin,* 514 F.2d 904, 908 (2d Cir.1975).

■ Appellants also contest the exclusion of statements by AUSA Mann regarding the polygraph exam taken, and apparently failed, by Tobias as part of the "boxing investigation." The statement was part of the September 17, 1982 letter from her to the Ohio judge and was redacted by the district court on the grounds that its prejudicial effect outweighed its probative value. Fed.R.Evid. 403. We have stated that polygraph evidence is speculative, *United States v. Williams,* 583 F.2d 1194, 1199 n. 9 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979). Appellants argue, however, that

---

**1.** We also conclude, therefore, that appointment of a psychiatrist (the psychiatrist submitting an affidavit was hired briefly by Faines's attorney at his own expense) was within the discretion of the district court.

the very request that he take the polygraph test might have given Tobias reason to suspect that the government did not believe him and caused him to fabricate his testimony about the escape. In light of the manifold evidence showing that Tobias was more than anxious to help the government at all pertinent times, further evidence offered for this purpose would have been superfluous. Exclusion, therefore, was proper.

■ Appellants also argue that a great deal of inflammatory and prejudicial evidence surrounding their activities prior to the night of August 2 was admitted, including, *inter alia,* Bari's threat to kill a guard, Faines's threat to harm anyone who implicated Daniel, the plan to attack a corrections officer on the street after the escape and take possession of his firearm, the plan to rob a bank, and the two knives discovered in the panel in the bathroom the day after the escape. However, this evidence was all logically connected to the escape attempt. *United States v. Bynum,* 485 F.2d 490, 498 (2d Cir.1973) (narcotics conspiracy furthered by plans to kill policeman), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); *United States v. Mourad,* 729 F.2d 195, 201 (2d Cir.) (narcotics conspiracy; gun found at home of one conspirator admissible against all), *cert. denied,* — U.S. —, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984); *Chandler v. United States,* 378 F.2d 906, 908 (9th Cir.1967) (use of stolen truck by escapees properly admitted). Because it enhanced the jury's understanding of the crime charged, it was not error to admit it. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[16], at 404–91 (1982).

■ Evidence of an assault on a guard in an escape attempt unrelated to appellants was also admitted and presents a somewhat different issue. The context of the admission was as follows. Officer La Rosa, who was called by the defense, testified that he saw no evidence of an escape attempt on August 2 during his 4 p.m. to midnight shift. He also testified that Officer Dixon, whose shift followed, did not report an escape attempt in the logbook. On cross-examination, the government elicited testimony that Officer Dixon had been assaulted in a previous unrelated escape attempt, presumably to raise an issue as to whether Dixon saw the present escape attempt but was too frightened to report it. While the relevance of this line of questioning seems marginal at best, it was clear to the jury that appellants were not involved in the prior escape, and, therefore, there was no prejudice to them.

■ Benfield challenges the admission of testimony regarding his prior and subsequent escape attempts. The government argues that Benfield opened the door to the prior escape attempt in his counsel's opening statement, which asserted that Benfield was on crutches with broken bones in "his foot, arm and hand" at the time of the conspiracy. In the prior escape attempt, Benfield had attempted to escape from a prison hospital despite having frostbitten feet. Although Benfield's counsel had not put intent in issue in the traditional sense by arguing mistake or accident, he nonetheless argued in his opening statement that Benfield's physical disabilities made it highly unlikely that he would join a conspiracy to escape. We believe the district court was within its discretion in permitting the government to rebut this argument in its case-in-chief by showing that, on a previous occasion, Benfield had attempted to escape despite a different, but still serious, physical disability.

The government argues that evidence of a subsequent escape attempt is relevant because Benfield denied his involvement in the instant conspiracy, thus putting his identity into issue. Similar acts evidence is admissible under Fed.R.Evid. 404(b) for purposes of proving relevant matters other than character. Evidence of Benfield's prior and subsequent escape attempts tend to prove the presence of a motivation to escape confinement which is relevant to participation in the escape attempt in the instant case.

■ Bari objects to admission of evidence of dried blood found on a metal bar discovered in the search of the bathroom on August 4. The FBI determined the blood to be type O, the same type as Bari. Bari argues that the evidence should have been excluded as not sufficiently probative, Fed.R.Evid. 403, because 45% of the population has type O blood. He adds that at least one additional blood test could have been performed by the government to identify the blood type more precisely but wasn't. Moreover, none of the other inmates were tested. However, there is no evidence that any other inmate in J Dorm had cuts on his hands at the time of the escape. Even if 45% of the population has type O blood (a fact told to the jury), the evidence, in connection with the other non-negligible evidence that Bari's cuts resulted from the escape attempt, had some "tendency to make the existence of [a] fact that is of consequence ... more probable [than not]." Fed.R.Evid. 401. *See United States v. Brown*, 699 F.2d 585, 594 (2d Cir.1983). The absence of further testimony goes to the weight of the evidence rather than its admissibility.

■ Daniel objects to the admission of the specific crime of which he was convicted and the length of the sentence he was serving in the MCC. Two of the elements of the crime of escape are lawful custody and arrest or conviction of a felony or misdemeanor.[2] Daniel's counsel was prepared to enter into a stipulation to the presence of these elements but the government insisted, with the district court's permission, on introducing evidence of the particular crime for which he was incarcerated and the length of his sentence. Daniel relies primarily on *United States v. Spletzer*, 535 F.2d 950 (5th Cir.1976), which held

that where a defendant stipulates to "the conviction and confinement elements," the "full record of the judgment of conviction [is] not relevant to the question of escape or ... intent to escape." *Id.* at 956 (citation omitted).

We conclude that admission of the evidence in question did not affect a "substantial right" in the instant case, Fed.R.Evid. 103(a). Daniel's presence in the MCC itself indicated prior criminal acts, and the evidence overwhelmingly showed that he was part of a band of dangerous criminals bent upon further crimes, including murder. The added specificity provided by the conviction and sentence could not have tipped the balance of proof in the jury's mind in this case. Whether, in cases where the escape lacks elements of intended violence, admission of such evidence after a proper stipulation has been offered by a defendant would constitute reversible error is not before us.

### 4. Daily Transcripts

■ Appellants, who are indigent, raise as error the refusal of the district court to provide daily transcripts under 18 U.S.C. § 3006A. In *United States v. Rucker*, 586 F.2d 899, 905 (2d Cir.1978), we stated that the decision to supply daily transcripts to indigent defendants is a matter within the discretion of the trial judge. However, in *Rucker* the government had not ordered daily transcripts for itself whereas it did in the instant case. Moreover, no provision was made for access by any of the defendants to either the daily copy received by the government or by the court. *Cf. United States v. Sliker*, 751 F.2d 477, 489-92 (2d

**2.** 18 U.S.C. § 751(a) provides:

(a) Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or commissioner, or from the custody of an officer or employee of the

United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined not more than $5,000 or imprisoned not more than five years, or both; or if the custody or confinement is for extradition or by virtue of an arrest or charge of or for a misdemeanor, and prior to conviction, be fined not more than $1,000 or imprisoned not more than one year, or both.

Cir.1984). We believe it is an abuse of discretion to decline either to order such transcripts or provide for other means of adequate access when the government is receiving them. The government's need for such transcripts should be regarded as conclusive evidence of a similar need by the defendants under § 3006A.

The refusal to provide daily transcripts was thus error. However, appellants, who now possess a complete transcript, point to not one instance of possible harm to them as a result of the lack of access to daily transcripts during trial. However, clear the error may be, we cannot reverse absent a showing of some injury.

### 5. *Ineffective Assistance of Counsel*

Benfield asserts that his sixth amendment right to counsel was violated because of ineffective assistance of counsel. We detail first the events on which this claim is based. Benfield's counsel engaged in little or no cross-examination of the government's witnesses. Although he began the trial by aggressively asserting that Benfield had "broken bones in his foot, arm and hand" at pertinent times and was unable to escape, he put on no direct evidence to support that claim. He did raise the matter twice on cross-examination but got answers indicating Benfield's good health. Nevertheless, the government was able to use his opening statement as a justification for introducing testimony on Benfield's prior escape attempt and, on summation, to point out that Benfield presented no evidence regarding his alleged injury, thus enjoying the best of both worlds. Following that, Benfield's attorney closed his own jury argument with this statement: "Weigh the evidence carefully and if you do so and apply the rules given to you by the court, you will arrive at a just verdict and that verdict should be guilty—I meant to say not guilty—a Freudian slip—on both charges as to Robert Benfield."

Finally, at his sentencing hearing, Benfield claimed that another MCC guard stated in a written memorandum that he had seen no evidence of an escape attempt as of August 2. Benfield also stated that he had given his attorney a list of witnesses who would exonerate him, as well as questions to ask, but that his attorney refused to interview or subpoena them.

In *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* 104 S.Ct. at 2064. The Court stated that a criminal defendant must show that counsel's performance was so deficient that counsel "was not functioning as ... counsel" guaranteed to the defendant by the sixth amendment, *id.*, and that the appellant must show that this failure so prejudiced the defense as to produce an unreliable verdict.

■ After examining the record in detail, we conclude that the representation afforded Benfield was not so deficient as to have tainted the verdict. With regard to the paucity of cross-examination, Benfield was one of six defendants and cross-examination occurred in the order of indictment, Benfield's turn being last. Given that the cross-examination undertaken by other counsel was devoted largely to impeachment and was vigorous and comprehensive, further cross-examination by Benfield's counsel might well have been counterproductive. In light of the evidence produced against Benfield at trial, the wholly conclusory claims with regard to other witnesses are not a sufficient factual basis to raise a factual issue as to a possibly deficient investigation or to justify a hearing.

■ The events relating to the broken bones are more troubling. However, Benfield makes no claim that the source of counsel's belief with regard to this issue was anyone other than himself or that the

attorney was not well advised to drop the matter after he was unable to elicit helpful testimony from witnesses who should have known the truth. The fact that things go wrong at trial does not justify reversing a conviction on sixth amendment grounds absent a plausibly substantial claim that a deficient professional performance was the cause. No such showing has been made here with regard to the broken bones claim.

██ Finally, the "freudian slip" remark at summation was clearly a mistake, but, given the character and degree of evidence against Benfield there is no serious possibility that it affected the result, even if the jury considered its implications. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* 104 S.Ct. at 2067 (citation omitted).

Affirmed.