UNITED STATES of America, Appellee,

v.

Joseph N. GALLO, Joseph Armone, Joseph Corrao, Robert DiBernardo, James Failla, Joseph Zingaro, Thomas Agro, Robert Desimone, Jack Giordano, Angelo Ruggiero, Anthony Vitta, George Daly, Louis Giardina, Salvatore Migliorisi, Julie Miron and Mildred Russo, Defendants,

Anthony Vitta, Joseph Armone, Salvatore Migliorisi, Joseph Gallo, Defendants–Appellants.

Nos. 63, 96, 97, 195, Dockets 88–1066, 88–1073, 88–1074 and 88–1082.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1988.

Decided Nov. 29, 1988.

John L. Pollok, New York City (Todtman, Hoffman, Epstein, Young, Goldstein, Tunick & Pollok, New York City, of counsel), for defendants-appellants Gallo and Armone.

Richard A. Rehbock, New York City, for defendant-appellant Vitta.

Stanley M. Meyer, New York City (DePetris & Meyer, New York City, of counsel), for defendant-appellant Migliorisi.

Maury S. Epner, Atty., Dept. of Justice, Washington, D.C. (Andrew J. Maloney, U.S. Atty. for the E.D. New York, Douglas E. Grover, Sp. Atty., Organized Crime Strike Force, Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, MINER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Anthony Vitta, Joseph Armone, Salvatore Migliorisi, and Joseph Gallo appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York following a jury trial before Judge Jack Weinstein. In a thirteen count indictment, defendants were charged with various offenses arising from their participation in a racketeering enterprise. Defendant Vitta was convicted of one count of conspiring to engage in racketeering in violation of 18 U.S.C. § 1962(d), one count of obstructing justice in violation of 18 U.S.C. § 1503, one count of aiding and abetting extortion and one count of conspiring to extort in violation of 18 U.S.C. § 1951(a). Vitta was sentenced to a total of 10 years of imprisonment and was fined $250,000. Defendant Armone was convicted of one count of conspiring to engage in racketeering in violation of 18 U.S.C. § 1962(d), one count of aiding and abetting bribery in violation of 18 U.S.C. § 201(b), one count of aiding and abetting interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952, one count of aiding and abetting extortion and one count of conspiring to extort in violation of 18 U.S.C. § 1951(a). Armone was sentenced to a total of 15 years of imprisonment and was fined $820,000. Defendant Migliorisi was convicted of one count of obstructing justice in violation of 18 U.S.C. § 1503, one count of aiding and abetting extortion and one count of conspiring to extort in violation of 18 U.S.C. § 1951(a). Migliorisi was sentenced to a total of three years of imprisonment and was fined $25,000. Defendant Gallo was convicted of one count of conspiring to engage in racketeering in violation of 18 U.S.C. § 1962(d), two counts of aiding and abetting bribery in

violation of 18 U.S.C. § 201(b), and one count of aiding and abetting interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952. Gallo was sentenced to a total of 10 years of imprisonment and was fined $380,000.

On appeal, Armone and Gallo contend that there was insufficient evidence to convict them of the bribery charge, there was insufficient evidence to convict Armone of the extortion charges, the government made improper use of immunized testimony given by Gallo before a state grand jury, evidence developed from the electronic surveillance of two co-conspirators should have been suppressed, and that the district court abused its discretion in limiting cross-examination of a government witness. Migliorisi contends that there was insufficient evidence to convict him of the extortion charges, and that the district court abused its discretion in denying him a separate trial. For the reasons stated below, we affirm the judgments of conviction as to all defendants on all counts.

## BACKGROUND

Vitta, Armone, Migliorisi, and Gallo were charged with participation in the affairs of the Gambino Crime Family racketeering enterprise. As originally constituted, the case below involved 16 defendants charged with the commission of various acts arising from their involvement with the "Family." In response to motions made by several defendants, however, seven separate trials were held. *See United States v. Gallo*, 668 F.Supp. 736 (E.D.N.Y.1987). Evidence at trial, which included electronic surveillance gathered from the homes and phones of co-defendant Anthony Ruggiero and unindicted co-conspirator Paul Castellano, showed the Family to be organized in a hierarchical fashion. Most of the Family's criminal activity is carried out by crews of "soldiers," often with the assistance of "associates," who are not members of the Family. Each crew is directed by a "captain." The captains, in turn, report to a "consiglieri," who is the third-ranking member of the Family, with responsibility for day-to-day operations. Family rules

dictate that a member may not engage in any criminal activity without the approval of his superior. The government's evidence at trial established that Gallo was consiglieri to the Family, Armone was the captain of a crew, Vitta was a soldier in Armone's crew, and Migliorisi was an associate of Vitta.

The indictment charged Vitta, Armone, and Gallo with conspiring to conduct and participate in the conduct of the affairs of the Gambino Family through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The alleged predicate acts of racketeering included, *inter alia*, bribery, obstruction of justice, interstate travel in aid of racketeering, extortion, and extortionate extension and collection of credit. In addition, defendants were charged with the substantive crimes which were alleged as predicate acts of racketeering.

At trial, Gambino Family associate Joseph Iannuzzi testified on behalf of the government regarding charges of bribing federal prison officials. Iannuzzi, who had a history of loansharking involvement with Armone crew member Thomas Agro, agreed to cooperate with an FBI investigation soon after he was severely beaten for failing to make timely payments on his debt to Agro. Iannuzzi testified that Dominic Cataldo, a recently convicted soldier of the Colombo Crime Family, had approached him and asked whether Iannuzzi could arrange through a "connection" in Washington, D.C., to have Cataldo assigned to a minimum security prison. In his undercover capacity, Iannuzzi determined that Cataldo was already so assigned. Thereafter, Iannuzzi contacted Cataldo, informed him of the assignment, and credited his connection for the arrangement.

In accordance with Family protocol, Cataldo subsequently contacted Agro to receive permission to have Iannuzzi perform another favor for a member of the Colombo Family. This time, Cataldo asked Iannuzzi to have his connection arrange the transfer of Carmine Persico, the boss of the Colombo Family, from a prison in Texas to the federal penitentiary in Danbury, Connecticut. One month later, Iannuzzi informed Cataldo that he would be able to arrange the Persico transfer, at a cost of $40,000, $25,000 of which was to go to Iannuzzi's connection. Persico was subsequently transferred at the request of the FBI. The Colombo Family, however, did not immediately pay for the favor.

In the meantime, Iannuzzi was requested by Agro to perform another favor, this time to effect the transfer of defendant Gallo's son. The Gambino Family feared that if Iannuzzi's connection was not paid for the Persico transfer, he would refuse to perform the favor for Gallo. Thereafter Agro, Gallo, and their superiors in the Gambino Family met with their Colombo Family counterparts, and it was agreed that the Colombos would pay $20,000 for the Persico transfer. To insure that his own favor would be accomplished, Gallo provided $20,000 in advance so that Iannuzzi could arrange the transfer of his son. Subsequently, Iannuzzi was given $20,000 by Cataldo in satisfaction of the Colombo Family obligation. In a conversation with Armone, Iannuzzi was told that he was doing "a real good thing" for which he would be rewarded. Agro later told Iannuzzi that he was made a "member" of Armone's crew.

George Yudzevich, who associated with the Gambino and other crime families, testified on behalf of the government regarding the extortion charges. Yudzevich operated a debt-collection agency and one of his clients was the Stewart Color Laboratory, a commercial photography business co-owned by Jerry Schochet. Testimony at trial revealed that Yudzevich, along with Vitta and Migliorisi, approached Schochet to try to "get [a] foot in the door of Stewart Color." Vitta told Schochet that he would obtain legal assistance if Yudzevich ever encountered problems collecting debts for Stewart Color, and asked how much this service was worth to Schochet. Schochet's response was less than what Vitta had hoped for, prompting Vitta to threaten to "crack [Schochet's] head open [with an ashtray] so he [could] watch the blood come down." An agreement was then reached, whereby Schochet would pay, in cash,

$1,000 per week to Vitta. Once each week for the next two weeks, Yudzevich and Migliorisi visited Schochet and collected an envelope filled with money. This money was given to Vitta, who kept some for himself, paid some to Yudzevich and Migliorisi, and paid the remainder to his superiors in the Family including Armone. After two weeks, Schochet indicated that he could not make the payments without placing someone on the payroll. Thereafter, Vitta, and later Migliorisi, were placed on the Stewart Color payroll.

## DISCUSSION

A. *Sufficiency of the evidence regarding the attempted bribery of public officials.*

Armone and Gallo contend that there was insufficient evidence relating to the bribing of public officials to support either a conviction on substantive bribery charges, or a finding that bribery constituted a predicate act to a pattern of racketeering. They argue that because the government did not prove the existence of a federal official to whom bribes were actually paid, proof that payment was made to a "connection in Washington" was not sufficient to prove the intent to bribe a public official. "[A] defendant who contends that the evidence was insufficient to convict him bears a very heavy burden." *United States v. Pedroza*, 750 F.2d 187, 198 (2d Cir.1984). In determining the sufficiency of evidence to support a conviction, a reviewing court must "view the evidence in the light most favorable to the government[,] ... credit every inference that could have been drawn in the government's favor, and uphold the conviction if, from the inference reasonably drawn, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt." *United States v. Walker*, 835 F.2d 983, 987 (2d Cir.1987) (citations omitted). ▮ Whether or not there was a federal official to whom bribes were actually paid is not determinative of the issue of intent. As we have stated, 18 U.S.C. § 201(b) "makes *attempted* bribery a crime, and so long as a bribe is 'offered or

promised' with the requisite intent 'to influence *any* official act' the crime is committed." *United States v. Jacobs*, 431 F.2d 754, 760 (2d Cir.1970) (emphasis in original), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971). To find such intent, the public official who is the target of the bribe need not be aware of the bribe, *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir.1980), and, in fact, need not even exist. *See United States v. Rosner*, 485 F.2d 1213, 1216 (2d Cir.1973) (affirming conviction where defendant attempted to funnel money to fictitious official), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). Armone and Gallo argue that payment of money to a "contact in Washington" could easily be understood to mean payment to a lobbyist or attorney. Evidence at trial, however, showed that defendants talked in codes, covered their "paper trail," and otherwise went to great lengths to keep secret their payments to a "connection" to buy such "favors" as the transfer of federal prisoners. Based on this evidence, a rational jury could fairly have concluded beyond a reasonable doubt that Armone and Gallo intended to bribe a public official.

B. *Sufficiency of the evidence regarding the extortion of Stewart Color Laboratory.*

▮ Armone and Migliorisi each contend that there was insufficient evidence to convict them of extorting the Stewart Color Laboratory. Armone argues that the evidence against him was insufficient because George Yudzevich, the government's primary witness regarding the extortion charges, admitted during cross-examination that he had never "discussed business" with Armone and that he had no personal knowledge as to whether Armone was aware of the extortion. Migliorisi argues that each of the witnesses who testified against him were not credible, and thus, there was insufficient evidence to render a conviction. As stated above, a defendant who contends that evidence was insufficient to convict him bears a very heavy burden. Neither Armone nor Migliorisi

have met this burden. The record is replete with evidence of the structure of the Gambino Crime Family and Armone's role as captain of a Gambino crew. Family protocol required Vitta to receive the approval of Armone, his captain, prior to engaging in criminal activity such as the extortion of a photography lab. In addition, wiretap evidence from the home of Family boss Paul Castellano showed Armone dutifully reporting to his superior that Vitta "got" Stewart Color Laboratory. Viewing this evidence and the inferences which might be drawn therefrom in the light most favorable to the government, a reasonable jury could fairly conclude beyond a reasonable doubt that Armone was guilty.

Migliorisi's argument that there was insufficient evidence to convict him due to the lack of credibility of the witness who testified against him is without merit. In an examination of the evidence to determine whether sufficient proof was adduced for the jury to find guilt beyond a reasonable doubt, "all issues of credibility must be considered questions solely within the jury's province." *United States v. Singh*, 628 F.2d 758, 766 (2d Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980). The jury was entitled to believe the witnesses who testified against Migliorisi, and we will not disturb their finding.

C. *Use of immunized grand jury testimony.*

■ Gallo contends that his conviction should be reversed and the indictment against him dismissed because the government used immunized grand jury testimony to build the case against him. Specifically, Gallo argues that his appearance, in 1967, before a Queens County, New York grand jury entitles him to transactional immunity because the 1967 investigation was actually a joint state-federal operation. In the alternative, Gallo asserts that even if only "use" immunity applies, the government improperly used his testimony. Both arguments, however, are without merit. Prior to the enactment of 18 U.S.C. § 6002 in 1970, the federal government could compel the testimony of a grand jury witness only pursuant to a grant of transactional immu-

nity. *See Kastigar v. United States*, 406 U.S. 441, 451–52, 92 S.Ct. 1653, 1660–61, 32 L.Ed.2d 212 (1972). The 1967 testimony, however, was given before a *state* grand jury. Although Gallo contends that the Queens District Attorney's Office was acting either in conjunction with, or under the direction of the FBI, the record contains no evidence that such was the case. Thus, Gallo was entitled to no more than use and derivative use immunity.

■ Whether the government made use of the grand jury testimony is an issue of fact, which the district court thoroughly examined by holding two *Kastigar* hearings, one before and one after trial. Accordingly, the district court's findings are not to be reversed unless clearly erroneous. *See United States v. Gaviria*, 740 F.2d 174, 182 (2d Cir.1984). Our independent review of the record reveals ample support for Judge Weinstein's finding that "[a]ll the information that was used by the government in this prosecution came to its attention from independent sources." Gallo has been the subject of government investigation and surveillance for over twenty years. Events, such as a 1966 meeting at a Queens restaurant, which Gallo claims became known to the government due to his grand jury testimony, were actually the subject of police surveillance. Agents involved in the current investigation testified that they did not even know of Gallo's grand jury appearance until Gallo raised it as an issue before the trial court. Furthermore, it should be noted that the nature of Gallo's grand jury testimony makes any claim of its direct or indirect use untenable. The testimony consisted mostly of denials and ambiguous answers. In short, there was nothing to use. The findings of the district court were not clearly erroneous.

D. *Use of electronic surveillance.*

Armone and Gallo contend that evidence and investigative leads derived from the electronic surveillance of co-conspirators Ruggiero and Castellano should have been suppressed for a variety of reasons. Specifically, they argue that the Castellano

surveillance should be suppressed because probable cause was lacking to authorize such a search, and there was too long of a delay between the granting of the order authorizing the wiretaps and their actual installation. They assert that the Ruggiero surveillance should be suppressed because it was more extensive than authorized. Finally, Armone and Gallo contend that the evidence from both locations should be suppressed because there were improper delays in sealing the tapes obtained by electronic surveillance. We find all of these arguments to be without merit.

Between November 12, 1982 and July 28, 1983, eight court orders were issued by United States District Court Judges Bramwell and McLaughlin authorizing the government to conduct electronic surveillance of Castellano's home. Since FBI agents found it difficult, if not impossible, to enter Castellano's home to install the listening devices immediately after the granting of the first three orders, the actual surveillance did not begin until after March 7, 1983. Tapes obtained by electronic surveillance were sealed from 3 to 36 days after the expiration of the individual authorizing orders. All of the tapes were sealed prior to the expiration of the final authorizing order on August 4, 1983. In a related case, co-defendant Joseph Corrao made the same claims with regard to the Castellano surveillance as are advanced by appellants here, and they were rejected by United States District Court Judge Kram. *United States v. Corrao,* No. 86 Cr. 0556 (S.D.N.Y. Apr. 8, 1988) (mem.) [available on WESTLAW, 1988 WL 36322]. The trial court relied on *Corrao* in denying appellants' motion to suppress the Castellano surveillance.

### 1. Probable cause

An order authorizing electronic surveillance may be issued upon showing that communications pertaining to a designated offense will be obtained, and that there is probable cause to believe an offense has been, or is about to be committed. 18 U.S.C. § 2518(1)(b)(i) & (3)(a). The standard of probable cause governing electronic surveillance is the same as for any other search warrant. *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed. 2d 776 (1978). We are guided by the principle that a "determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (citation omitted). Thus, our role is merely to determine whether the issuing court had a "substantial basis" for concluding that electronic surveillance would uncover evidence of wrongdoing. *Id.* at 236–39, 103 S.Ct. at 2331–33.

■ We find that a substantial basis existed for the district court to conclude that a wiretap of the Castellano home would uncover evidence of unlawful activity. Electronic surveillance at another location provided probable cause to believe that organized crime activity was taking place at the Castellano home. A number of FBI confidential informants provided evidence of criminal activity and discussions of criminal activity occurring there. One informant, who had been cooperating with the FBI for eight years, stated that he personally took part in discussions of illegal activity at the Castellano home. In addition, physical observation of the home revealed the frequent presence of those alleged to be involved in the criminal activity. Viewing all of the evidence in its entirety, and testing it in common sense fashion, *see United States v. Harris,* 403 U.S. 573, 577, 91 S.Ct. 2075, 2079, 29 L.Ed.2d 723 (1971), we conclude that probable cause existed to order electronic surveillance of the Castellano home.

### 2. Delay

■ The government's delay in initiating the Castellano surveillance does not provide grounds for its suppression. The affidavit submitted by the government stated that "it was impractical, if not physically impossible, for Special Agents of the FBI to effect surreptitious entry into [the Castellano home] for the purpose of installing interception devices, without significant likelihood of detection." We find this to be

an adequate explanation for the delay. We further find that probable cause for the initial order authorizing electronic surveillance did not become stale during the delay, and that each extension of the order was independently supported by probable cause. We previously have determined that "the principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). The supporting affidavits in this case presented "a picture of continuing conduct," *id.,* as opposed to an isolated instance of wrongdoing. Thus, "the passage of time between the last described act and the presentation of the application becomes less significant." *Id.* Furthermore, probable cause was "freshened" by visual surveillance of the Castellano home which revealed frequent new visits by Castellano's alleged criminal associates. The district court's refusal to suppress the fruits of the Castellano surveillance because of the delay in its initiation was proper.

### 3. Compliance with authorization

■ Armone and Gallo also challenge the use of evidence derived from electronic surveillance of the home and phone of co-defendant Angelo Ruggiero. Between November 1981 and June 1982, six orders were issued by the United States District Court for the Eastern District of New York authorizing the government to conduct electronic surveillance of the home and phone of Ruggiero. Neither Armone nor Gallo were named as targets of the surveillance. The order issued on April 5, 1982 specified, *inter alia,* that the "[i]nterception ... be suspended immediately when it is determined ... that none of the named interceptees ... are participants in the oral or wire conversations." Armone and Gallo contend that the government failed to comply with this restriction, and thus, all of the Ruggiero surveillance should be suppressed. We disagree.

Title 18 U.S.C. § 2518(10)(a)(iii) provides that "[a]ny aggrieved person" may make a motion to suppress wiretap evidence when "the interception was not made in conformity with the order of authorization." This provision, however, is to be construed in accordance with standing requirements usually applied to suppression claims under the fourth amendment. *Alderman v. United States,* 394 U.S. 165, 175–76 & n. 9, 89 S.Ct. 961, 967–68 n. 9, 22 L.Ed.2d 176 (1969); *see* S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2179–80. The Supreme Court has held that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman,* 394 U.S. at 171–72, 89 S.Ct. at 965–66. Here, the arguments advanced by Armone and Gallo do no more than assert Ruggiero's own right to minimize the surveillance of his home and phone. Defendants were not named as targets of the surveillance, nor were they part of the conversations that allegedly exceeded the restrictions contained in the authorizing order. Applying the usual standards governing claims of fourth amendment violations, we find that Armone and Gallo lack standing to contest the Ruggiero surveillance. *See United States v. Fury,* 554 F.2d 522, 526 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

### 4. Sealing

■ Finally, defendants contend that evidence derived from both locations should be suppressed because of improper delays in sealing the tapes made of the surveillance. Title 18 U.S.C. § 2518(8)(a) requires that tapes made by electronic surveillance be sealed "[i]mmediately upon the expiration of the period of the order, or extensions thereof." Appellants' arguments are based on a misunderstanding of when the periods of the orders terminated. This court has previously determined that "extensions,"

as used in the phrase "period of the order, or extensions thereof" is to be understood in a common sense fashion as encompassing all consecutive continuations of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same crimes, and substantially the same persons.

*United States v. Vazquez,* 605 F.2d 1269, 1278 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). Defendants' claims that there were delays in sealing tapes upon the expiration of some of the intermediate orders thus are not determinative of the issue before us. Evaluation of the orders issued shows that the Castellano home was subject to "consecutive continuations" of the wiretap order. Thus, the period of the order authorizing the Castellano surveillance ended with the termination of the final order on August 4, 1983. Since all of the Castellano tapes were sealed by August 2, 1983, the district court's denial of defendants' motion to suppress was proper.

The Ruggiero surveillance was conducted pursuant to six authorizing orders which fall into two groups, one covering the period from November 9, 1981 to March 6, 1982, and one covering the period from April 5, 1982 to July 7, 1982. In a related case, this court examined a sealing delay following the period ending July 7, 1982, and determined that the surveillance should not be suppressed. *See United States v. Massino,* 784 F.2d 153 (2d Cir. 1986). On this appeal, Armone and Gallo contend that the sealing requirement was triggered by the expiration of an intermediate order on January 28, 1982. However, evaluation of the orders expiring on January 28, and beginning on February 4, show them to be "consecutive continuations" of the same wiretap order. Accordingly, we find the date of expiration which triggered the sealing requirement for the Ruggiero surveillance to be March 6, 1982.

■ Defendants next contend that the Ruggiero surveillance should be suppressed because it was not sealed until March 11, 1982. We disagree. It is well settled in this circuit that suppression is not automatically warranted when sealing is not immediate; rather, suppression is required when the government cannot satisfactorily explain the delay. *See, e.g., Massino,* 784 F.2d at 157; *United States v. McGrath,* 622 F.2d 36, 42 (2d Cir.1980); *United States v. Gigante,* 538 F.2d 502, 504 (2d Cir.1976). The government's explanation must be weighed against such factors as the length of delay, the absence of good faith, the time needed for administrative processing, and the prejudice to the defendant. *See Massino,* 784 F.2d at 157. We find that the government has satisfactorily explained the five-day sealing delay that occurred here. The authorizing order expired on March 6, 1982—a Saturday—rendering any action by the government on the next day impossible. The government then required 3 days—March 8, 9, and 10—for administrative processing, and the tapes were sealed on March 11, 1982. The record contains no evidence of bad faith on the part of the government, or of prejudice incurred on the part of the appellants. We therefore find no error in the district court's denial of defendants' motion to suppress the fruits of the Ruggiero surveillance.

### E. *Restriction of the cross-examination of Yudzevich.*

■ Armone and Gallo contend that the district court abused its discretion by limiting the cross-examination of government-witness George Yudzevich. In a case pending in California, Yudzevich was charged with the commission of various crimes. Armone and Gallo argue that the trial court's decision to limit the cross-examination concerning these charges, along with an instruction to the jury to assume Yudzevich's guilt concerning the charges, deprived them of a fair trial. We disagree.

A district court has broad discretion over the scope of cross-examination. *See United States v. Bari,* 750 F.2d 1169, 1178 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). This discretion "includes reasonable control to make the interrogation ... effective for

the ascertainment of the truth and to avoid needless consumption of time." *United States v. Clark*, 613 F.2d 391, 407 (2d Cir. 1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). An exercise of this discretion will not be overturned absent a clear showing of abuse. *See Bari*, 750 F.2d at 1178.

Cross-examination of Yudzevich consumed three days. In response to questioning, Yudzevich admitted that he had committed numerous crimes over the years. In regard to questions about the charges pending in California, however, Yudzevich invoked his fifth amendment privilege against self-incrimination. After balancing the defendants' sixth amendment rights to test the credibility of the witness against them, and Yudzevich's fifth amendment rights, the district court instructed the jury that they were to assume that Yudzevich was guilty of the crimes charged in California. Further cross-examination regarding the California charges could do no more than establish Yudzevich's guilt—an issue already settled by the trial court's instruction. The trial court's determination that such questioning would unnecessarily prolong the trial was well within its discretion and will not be disturbed.

### F. *Denial of motion for a separate trial.*

█ Migliorisi contends that the trial court abused its discretion in denying his motion for a separate trial. Specifically, Migliorisi argues that he was deprived of a fair trial when the district court offered him the choice of proceeding separately in May 1987, or as a co-defendant in September 1987, because his counsel of choice was unavailable in May 1987. This contention is without merit.

A trial court has wide discretion in considering a motion to sever pursuant to Fed. R.Crim.P. 14. *United States v. Sliker*, 751 F.2d 477, 492 (2d Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). In order to demonstrate an abuse of this discretion, a defendant bears the "extremely difficult burden" of showing that substantial prejudice resulted from the denial of the motion. *United States v.*

*Werner*, 620 F.2d 922, 928 (2d Cir.1980). It must further be shown that the prejudice resulted from the joinder, not merely that the defendant "might have had a better chance for acquittal at a separate trial." *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir.1978).

Migliorisi and various other of the 16 original co-defendants in this case made motions to sever. The district court granted the motions in part, resulting in seven trials. *United States v. Gallo*, 668 F.Supp. 736 (E.D.N.Y.1987). Judge Weinstein determined that Migliorisi would be prejudiced if tried together with all 16 co-defendants, but that no prejudice would result from being tried along with Vitta, Armone, and Gallo. Having made that determination, the court offered Migliorisi the option of going to trial individually in May, when the court had an opening, or proceeding with the group in September. Migliorisi chose to proceed in September. Migliorisi's contention that this was "no choice," since counsel of his choice was unavailable in May, misses the mark. His arguments are of the nature that he might have had a better chance for acquittal had he been tried alone. Migliorisi, however has shown no prejudice suffered as a result of his being tried along with the other defendants here. Accordingly, we find the denial of Migliorisi's severance motion, to the extent he sought to be tried alone, to be a proper exercise of the district court's discretion.

### CONCLUSION

We have considered the appellants' remaining arguments and find that each of them is without merit. In light of the foregoing, the judgments of conviction are in all respects affirmed.